# In the United States Court of Federal Claims

CAN SOFTTECH, INC.,

                *Plaintiff,*

v.

THE UNITED STATES,

                *Defendant,*

   and

THE GREENTREE GROUP, INC.,

             *Defendant-Intervenor.*

No. 24-670
(Filed: October 4, 2024)[1]

*Roger V. Abbott*, Miles & Stockbridge P.C., Washington, DC, for Plaintiff.

*Laura Offenbacher Aradi*, Civil Division, United States Department of Justice, Washington, DC, for Defendant.

*Robert Guy Hanseman*, Sebaly Shillito & Dyer, Dayton, OH, for Defendant-Intervenor.

## OPINION AND ORDER

**LERNER,** *Judge.*

       This is a post-award bid protest. Plaintiff CAN Softtech, Inc. ("CSI") challenges the General Services Administration's ("GSA" or "the Agency") award of a contract to provide information technology support for the Air Force. The Agency awarded the contract to The Greentree Group, Inc. ("Greentree" or "Intervenor"). Greentree is the incumbent. After conducting a technical evaluation, the Agency determined CSI's and Greentree's technical proposals—the highest rated—were comparatively equal and selected Greentree because it offered a lower price. AR 1726.

---

[1]      The Opinion was filed on September 20, 2024, and the parties were afforded fourteen days to propose redactions. Opinion & Order, ECF No. 53. The parties jointly proposed redactions. ECF No. 55. Accordingly, the Court reissues this Opinion with the agreed-upon redactions, which are noted with bracketed asterisks, i.e., [***].

According to CSI, the Agency's selection process was arbitrary and capricious because it unfairly credited Greentree for its incumbency; failed to penalize Greentree for its presentation of information about a staffing reduction; did not address the staffing reduction, leading to a tainted analysis of level of effort; under-explained the rationale for its technical ratings; and conducted an insufficiently detailed best-value tradeoff. Pl.'s Am. Mot. for J. on the Admin. R. at 1–4 ("Pl.'s Mot."), ECF No. 37. In response, the Government and Intervenor claim GSA met the minimum standards of detail and analysis under the solicitation, the Federal Acquisition Regulation ("FAR"), and applicable caselaw.

Before this Court are the parties' Cross-Motions for Judgment on the Administrative Record. Pl.'s Mot.; Def.'s Resp. and Cross-Mot. for J. on the Admin. R. ("Def.'s Mot."), ECF No. 40; Def.-Intervenor's Resp. and Cross-Mot. for J. on the Admin. R. ("Def.-Intervenor's Mot."), ECF No 41. For the reasons below, Plaintiff's Motion is **DENIED**. Defendant's and Defendant-Intervenor's Cross-Motions are **GRANTED**.

## I.    Factual Background

### A.    The Solicitation and Governing Procurement Procedures

On or around January 9, 2024, GSA issued Solicitation No. 47QFLA24Q0042 for "Program IT Professional Support Services for Financial Information Systems" ("the solicitation" or "RFQ") and amended it on January 18, 2024. AR 604, 539–540. The contract was to provide information technology support to the Secretary of Air Force of Financial Management ("SAF/FM") and the SAF/FM's Air Force Financial Services Office's ("AFFSO") Financial Management Information Systems Office. AR 541. Greentree had been the incumbent on the contract since March 2012. AR 414, 542. The RFQ stated that the contract's pricing was firm-fixed-price with cost reimbursable travel and other direct costs. AR 541. The period of performance was a one-year base period with four one-year options. *Id.*

The solicitation requested quotes issued against the GSA Multiple Awards Schedule ("MAS"). AR 541. The RFQ explicitly provided "[t]his is not a FAR Part 15 negotiated competition; therefore, the procedures in FAR 15.3 (Source Selection) DO NOT apply to this solicitation." AR 550–551. The parties agree that the solicitation, as a MAS procurement, was a Federal Supply Schedule ("FSS") procurement controlled by FAR 8.4 and in particular, FAR 8.405-2(d)'s rules governing evaluations. *See, e.g.*, AR 434 (citing FAR 8.4 as the "acquisition authority"), 800 (CSI's submission of FSS price list information with its quote), 1720 (evaluating pricing per FAR 8.405-2(d)); Pl.'s Mot. at 17–18 (interpreting FAR 8.405-2(d)); Def.'s Mot. at 4 (same). *See also* FAR 8.405-2(d). The solicitation included a lengthy Performance Work Statement ("PWS") detailing contract activities and requirements. AR 570–603.

### B.    Evaluation Criteria and Requirements Relevant to Staffing Plan

Offerors were asked to submit two volumes. In Volume 1 – Non-Price, offerors had to address three evaluation factors and various subfactors: Factor 1, Technical Approach (with 10 subfactors); Factor 2, Management and Staffing Plan (six subfactors); and Factor 3, Past Performance and Experience (two subfactors). AR 543–49. Volume II – Price was to contain price information broken out by labor category and entered on a standardized pricing template. AR 549. GSA first evaluated the proposals on seven mandatory pass/fail factors. AR 543. Then the Agency conducted a technical evaluation of the three Non-Price evaluation factors and

2

assessed how the offeror would address the tasks in the PWS according to the subfactors.  AR 545–49.

| Volume | Factor | Subfactors |
|---|---|---|
| Volume I – Non-Price | 1 - Technical Approach | Ten subfactors |
| | 2 - Management & Staffing Plan | Six subfactors |
| | 3 - Past Performance & Experience | Two subfactors |
| Volume II – Price | 4 - Price | |

At issue in this protest are the evaluation criteria for Factor 2, Subfactors 1 and 4:

> 3.3. EVALUATION FACTOR 2 – MANAGEMENT AND STAFFING PLAN:
> *The contractor shall describe their staffing approach for completing the PWS tasks.*  The Government will review the offeror's proposed management & staffing plan.  The Government will determine the degree to which the proposed management & staffing plan:
>
> > 3.3.1   Subfactor 1 - Demonstrates the offeror's ability to administer the support services and provide the staffing necessary to perform the work outlined in the PWS.
> >
> > . . .
> >
> > 3.3.4   Subfactor 4 - Demonstrates the offeror's understanding and technical approach for managing resources to meet schedule and performance, to include post-award start-up actions.

AR 546 (emphasis in original).

The RFQ also contained specific requirements for submitting a staffing plan.  It stated that the "management and staffing plan MUST include" a "project staffing plan that contains all proposed individuals that will be working on the resultant task order and how the offeror will manage" the needs of the PWS.  AR 547.  In addition, evaluators needed to assess whether offerors provided a "project staffing rationale" that "describe[s] its rationale for the proposed labor mix and level of effort to support each task" and "describe[s] what factors drove its proposed labor mix."  *Id.*  And the offeror was required to "ensure there is consistency in the level of effort between the project staffing plan provided and the price quote, being cognizant of rounding issues."  *Id.*  As for the Price Volume, offerors needed to ensure it was "consistent with the technical submission in all respects."  AR 550.  The RFQ also explained that "[t]he information in the price submission will be shared with the technical evaluators to determine if pricing is reasonably aligned with the proposed labor mix to perform the duties as required by the PWS."  *Id.*

The RFQ provided that the Factors and Subfactors would be evaluated separately and assessed using adjectival ratings.  AR 551.  "Each subfactor will receive a rating and the overall factor will receive a combined rating" based on the subfactor ratings.  AR 552.  The ratings were as follows:

| Combined Technical/Risk Ratings | | |
|---|---|---|
| Color | Rating | Description |
| Blue | Outstanding | Proposal meets requirements and indicates an exceptional approach and understanding of the requirements.  Strengths far outweigh any weaknesses.  Risk of unsuccessful performance is very low. |
| Purple | Good | Proposal meets requirements and indicates a thorough approach and understanding of the requirements. Proposal contains strengths which outweigh any weaknesses.  Risk of unsuccessful performance is low. |
| Green | Acceptable | Proposal meets requirements and indicates an adequate approach and understanding of the requirements. Strengths and weaknesses are offsetting or will have little or no impact on contract performance. Risk of unsuccessful performance is no worse than moderate. |
| Yellow | Marginal | Proposal does not clearly meet requirements and has not demonstrated an adequate approach and understanding of the requirements.  The proposal has one or more weaknesses which are not offset by strengths.  Risk of unsuccessful performance is high. |
| Red | Unacceptable | Proposal does not meet requirements and contains one or more deficiencies.  Proposal is unawardable. |

*Id.*

Finally, after the factors and subfactors received technical ratings, RFQ Section 4.1. provided for a "Comparative Analysis trade off approach, which seeks to select an offeror with the best value to meet the Government's need."  AR 551.  The RFQ explained the "Comparative Analysis process (comparing submissions to the apparently successful best value offeror) compares differences in the value of the contractors' non-price features and differences in price." *Id.*  As for the importance of price, the RFQ specified that the "Non-price factors, when combined, are significantly more important than the price factor."  AR 553.  But the RFQ explicitly stated that price could become controlling:

> [P]rice is not expected to be the controlling factor in the selection of a contractor, but the degree of importance of price as a factor could become greater depending upon the equality of the quotes for other factors evaluated.  When competing quotes are determined to be substantially equal after evaluation of all non-price factors, the price factor could become the controlling factor.  A single contractor will be selected whose quote provides the Government a best value solution.

AR 551.

The RFQ's historical information section stated that the contract was for an "estimated 71" full-time employees ("FTEs").  AR 542.  This FTE number was "provided for informational purposes only" and contractors were not required "to quote at these funding levels." *Id.*  The RFQ added that "proposing a different level of effort is determined by the contractor's technical approach." *Id.*  But the RFQ required that "any deviations +/- 10%" from the existing 71 FTEs currently serving on the contract "must be addressed within the quote." *Id.*

### C.    Offerors' Submissions and Evaluation Results

GSA received proposals from four offerors: CSI, Greentree, [***], and [***].  AR 1719.  In accordance with its Acquisition Plan, GSA convened a Technical Evaluation Board ("TEB") composed of three technical evaluators from AFFSO, one from GSA, and the Contracting Officer ("CO"), also from GSA.  AR 423 (Acquisition Plan), 1719.  The CO did not vote on technical evaluations but reviewed the price quote and participated in the final award decision.  *Id.*

First, the three AFFSO evaluators produced individual Technical Evaluation Reports ("TERs") for each offeror (for a total of twelve).  The evaluators provided qualitative feedback under each of the Non-Price Factors and Subfactors, noting particular "strengths," whether the offeror "meets" the evaluation criteria, and any "weaknesses."  AR 1545–1682.  Next, between February 6 and February 29, 2024, the five TEB members convened "to complete the technical evaluation . . . via a verbal consensus discussion process."  AR 1719.  The results of that process were documented in the Non-Price Factors Consensus Report ("Consensus Report"), dated March 20, 2024.  AR 1728.  The Consensus Report replicated the individual TERs' format.  It assessed each offeror separately, and identified separate qualitative strengths, meets, and weaknesses under the evaluation subfactors.  AR 1732–1766.  Each evaluation was around eight pages.  *Id.*  The TEB then assigned adjectival ratings to the subfactors of Factors 1 and 2, as required by the RFQ:

| | Offeror | | | |
|---|---|---|---|---|
| **Subfactor** | **Can Softtech** | **[***]** | **[***]** | **Greentree** |
| **Evaluation Factor 1: Technical Approach** | | | | |
| Subfactor 1 | Outstanding | [***] | [***] | Outstanding |
| Subfactor 2 | Outstanding | [***] | [***] | Outstanding |
| Subfactor 3 | Good | [***] | [***] | Outstanding |
| Subfactor 4 | Acceptable | [***] | [***] | Outstanding |
| Subfactor 5 | Acceptable | [***] | [***] | Good |
| Subfactor 6 | Good | [***] | [***] | Outstanding |
| Subfactor 7 | Acceptable | [***] | [***] | Acceptable |
| Subfactor 8 | Acceptable | [***] | [***] | Acceptable |
| Subfactor 9 | Acceptable | [***] | [***] | Acceptable |
| Subfactor 10 | Acceptable | [***] | [***] | Acceptable |
| **Evaluation Factor 2: Management & Staffing Plan** | | | | |
| Subfactor 1 | Good | [***] | [***] | Outstanding |
| Subfactor 2 | Acceptable | [***] | [***] | Acceptable |
| Subfactor 3 | Acceptable | [***] | [***] | Good |
| Subfactor 4 | Acceptable | [***] | [***] | Good |
| Subfactor 5 | Acceptable | [***] | [***] | Acceptable |
| Subfactor 6 | Acceptable | [***] | [***] | Outstanding |

AR 1769.

Finally, the TEB assessed the following overall adjectival ratings for Factors 1, 2, and 3:

| Contractor | Technical Approach | Management and Staffing | Past Performance |
|---|---|---|---|
| CAN SOFTECH INC - 47QTCA21D00DL | Outstanding | Good | Substantial Confidence (Very Relevant/Recent) |
| [***] | [***] | [***] | [***] |
| GREENTREE GROUP, INC. - GS35F396DA | Good | Outstanding | Substantial Confidence (Very Relevant/Recent) |
| [***] | [***] | [***] | [***] |

AR 1768.

### D.    Award Decision

Based on the Consensus Report's adjectival ratings and the proposals' underlying merits, the CO made an award decision. *See* AR 1708–27. The CO first conducted a Price Review. AR 1720. The evaluation included a phase-in period, the base year, option years one through four, and an estimated six-month extension. AR 1720. The CO explained that the Independent Government Cost Estimate ("IGCE") estimated 69.6 FTEs, and the projected contract price was $79,880,481.86. AR 1720–21. The CO found the offerors' "proposed rates to be fair and reasonable because they [were] equal or less than the rates in the vendor's Multiple Award Schedule." AR 1720. Greentree offered the lowest price, [***]. AR 1721. CSI's price—the highest—was [***]. *Id.* The Price Review reflected that all offerors' prices were less than the IGCE's estimated price and provided comparison charts, including one showing CSI's proposal was 18.2% lower and Greentree's was [***] lower:

| | Solicitation No: 47QFLA24Q0042 | | | | | |
|---|---|---|---|---|---|---|
| **GCE** | **$79,880,481.86** | | | | | |
| **Can Softtech Inc** | [***] | Is | -18.20% | LOWER THAN | $79,880,481.86 |
| [***] | [***] | [***] | [***] | [***] | $79,880,481.86 |
| **Greentree** | [***] | Is | [***] | LOWER THAN | $79,880,481.86 |
| [***] | [***] | [***] | [***] | [***] | $79,880,481.86 |
| | Note: Table is inclusive of calculations with the 52.217-8 extension | | | | | |

*Id.* Although the tables depicted the offerors' prices, they did not represent the offerors' proposed FTEs underlying those prices. *Id.*

Next, the CO conducted a comparative analysis of each offeror's proposal. AR 1722–26. Beginning with Greentree, the CO reviewed the overall technical ratings assessed by the Consensus Report and commented on specific merits and weaknesses of each evaluation factor. *Id.* At the end of the three other offerors' analyses, the CO compared the offerors' proposals and ratings to Greentree's. AR 1723 (comparing CSI to Greentree), 1724 (same for [***]), 1725 (same for [***]).

Finally, in a "Comparison of the highest scoring offerors," the CO restated CSI's and Greentree's technical ratings:

| Contractor | Technical Approach | Management and Staffing | Past Performance |
|---|---|---|---|
| CAN SOFTTECH INC - 47QTCA21D00DL | Outstanding | Good | Substantial Confidence (Very Relevant/Recent) |
| GREENTREE GROUP, INC. - GS35F396DA | Good | Outstanding | Substantial Confidence (Very Relevant/Recent) |

AR 1725.

After stating that CSI's "non-priced evaluation factors were rated comparatively equivalent overall" to Greentree's, the CO recognized "[CSI's] price is substantially higher than" Greentree's. AR 1725. The CO concluded that "[a]lthough both [CSI] and [Greentree] offered the Government strong technical proposals, there is not a significant enough difference between the two which would justify the increased cost of [***] over the lifetime of the Task Order." AR 1726. The CO awarded the contract to Greentree because it determined it "offered the 'Best Value' to the Government, price and non-price factors considered." *Id.*

The Agency notified unsuccessful offerors on March 22, 2024. AR 1778–89. CSI requested a debriefing, which it received in a meeting on April 2, in written responses on April 11, and in follow-up communications on April 22. AR 1799–1805.

### E.   Procedural Background

On April 26, 2024, CSI filed its Complaint in this Court. Compl. On May 3, Greentree filed an unopposed Motion to Intervene. ECF No. 11. On June 14, CSI moved for Judgment on the Administrative Record and filed an amended Complaint. ECF No. 34. Plaintiff amended its Motion for Judgment on the Administrative Record on June 20. Pl.'s Mot. The Government and Greentree filed their cross-motions and responses on July 12. Def.'s Mot.; Def.-Intervenor's Mot. CSI replied on July 29. Pl.'s Reply, ECF No. 44. The Government and Greentree replied on August 15. Def.'s Reply, ECF No. 46; Def.-Intervenor's Reply, ECF No. 47. The parties' motions are now fully briefed.

## II.   Jurisdiction

The Court of Federal Claims has jurisdiction over protests by "an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract . . . or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1). This Court has jurisdiction to adjudicate Plaintiff's claims because CSI submitted a quote in response to the solicitation and asserts it would have received the award if not for the Agency's alleged errors.

## III.   Standard of Review

At issue is whether the Agency's decision was arbitrary, capricious, an abuse of discretion, or contrary to law. *Celerapro, LLC v. United States*, 168 Fed. Cl. 408, 425 (2023). "[T]he Court reviews the agency's procurement decision to determine whether it is supported by the administrative record." *PAE Applied Techs., LLC v. United States*, 154 Fed. Cl. 490, 504 (2021). "[A] reviewing court may set aside a procurement action if (1) the procurement

official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (internal quotation marks omitted). "Ultimately, if the Court finds an agency is within its bounds, it is not for the Court to substitute its own judgment for that of the agency." *CeleraPro*, 168 Fed. Cl. at 425 (citing *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1371 (Fed. Cir. 2009)).

In reviewing procurement decisions, the Court applies a "presumption of regularity" and should not substitute its judgment for that of the agency. *Logistics Co., Inc. v. United States*, 163 Fed. Cl. 542, 553 (2022). Contracting officers are "entitled to exercise discretion upon a broad range of issues." *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001) (citation omitted). "For that reason, procurement decisions invoke highly deferential rational basis review." *Savantage Fin. Servs., Inc. v. United States*, 595 F.3d 1282, 1286 (Fed. Cir. 2010) (cleaned up). "The rational basis test asks 'whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion.'" *Dell Fed. Sys., L.P. v. United States*, 906 F.3d 982, 992 (Fed. Cir. 2018) (quoting *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1351 (Fed. Cir. 2004)).

"The natural advantage that an incumbent may have is permissible" in the bidding process. *Omega World Travel, Inc. v. United States*, 54 Fed. Cl. 570, 575 (2002). "An agency . . . is not obligated to equalize all other offerors with an incumbent." *Id.* "While an agency may not unduly tip the scales in favor of an incumbent contractor, an agency is not required to ignore the benefits or advantages derived from an offeror's incumbency, and it likewise need not attempt to level the playing field for all other offerors." *Crowley Gov't Servs., Inc. v. United States*, 158 Fed. Cl. 358, 367 (2022).

The Court reviews claims of inadequate documentation under the APA's arbitrary and capricious standard. *E.g.*, *G4S Secure Sols. (USA), Inc. v. United States*, 146 Fed. Cl. 265, 269 (2019), *aff'd*, 829 F. App'x 518 (Fed. Cir. 2020). An agency's decision does not violate the APA if the agency "provided a coherent and reasonable explanation of its exercise of discretion." *Id.* This standard applies even if the clarity of the agency's decision is "less than ideal," so long as "the agency's path may reasonably be discerned." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 513–14 (2009). "[I]t is not arbitrary for an agency to not provide detailed explanations of the reasons an approach is adequate, unless this subjective judgment can be shown to be inconsistently reached." *Inspace 21 LLC v. United States*, 128 Fed. Cl. 69, 89 (2016).

Furthermore, "[t]he amount of documentation required in a FAR 8.4 streamlined procurement is far less than that required by FAR 15." *G4S Secure Sol. (USA), Inc.*, 146 Fed. Cl. at 270. "[U]nder FAR subpart 8.4, the contracting officer is required to document the 'basis for the award decision,' which 'should include the evaluation methodology used in selecting the contractor, the rationale for any tradeoffs in making the selection, and a price reasonableness determination for services requiring a statement of work.'" *Trillion ERP Venture Tech LLC v. United States*, 161 Fed. Cl. 531, 550–51 (2022) (quoting FAR 8.405(a)(7)(viii)). But although FAR 8.4 requires only "minimal documentation, [a]n agency [still] must articulate a satisfactory explanation for an action to permit effective judicial review." *DigiFlight, Inc. v. United States*, 165 Fed. Cl. 588, 601 (2023) (internal quotations omitted) (alteration in original).

In a "best value" procurement, "[p]rocurement officials have substantial discretion to determine which proposal represents the best value for the government." *E.W. Bliss Co. v.*

*United States*, 77 F.3d 445, 449 (Fed. Cir. 1996). "A court reviewing a best value procurement agency action must be highly deferential, and the agency that made the determination in question is presumed to have acted in a reasonable and rational manner." *Med. Dev. Int'l, Inc. v. United States*, 89 Fed. Cl. 691, 702 (2009). And an even "lower threshold applies for a FAR Part 8 tradeoff analysis." *Distributed Sols., Inc. v. United States*, 106 Fed. Cl. 1, 24 (2012), *aff'd*, 500 F. App'x 955 (Fed. Cir. 2013). In a FAR 8.4 best value procurement, "the Agency is neither expected nor required to document every decision it makes in rigorous detail." *Integrated Fin. & Acct. Sols., LLC v. United States*, 161 Fed. Cl. 475, 496 (2022) (citing *22nd Century Techs., Inc. v. United States*, No. 21-1137, 2021 WL 3856038, at \*10 (Fed. Cl. July 21, 2021)). The Court will uphold an agency's best value decision if it was a "coherent and a reasonable exercise" of the contracting officer's discretion. *Allied Tech. Grp., Inc. v. United States*, 94 Fed. Cl. 16, 50 (2010), *aff'd*, 649 F.3d 1320 (Fed. Cir. 2011).

## IV.   Discussion

CSI asserts that GSA and Greentree made five related errors that compromised the award: 1) GSA improperly awarded Greentree strengths under Factor 2 based only on its incumbency rather than the merits of the proposal; 2) Greentree violated the RFQ by presenting its plan to reduce the number of FTEs in the contract's option years across two different volumes rather than addressing it in the Non-Price volume; 3) GSA failed to properly consider and analyze Greentree's proposed FTE reduction; 4) the Agency's decision was generally under-documented and inconsistent; and 5) the Contracting Officer's best value tradeoff was insufficient. Pl.'s Mot. at 1–4.

### A.   The Agency Did Not Improperly Credit Greentree's Incumbent Status.

First, CSI challenges strengths awarded to Greentree under Factor 2's subfactors. Pl.'s Mot. at 27. Greentree received four strengths under Factor 2. AR 1755–57. CSI claims that the Agency improperly awarded strengths under Subfactors 1 and 4 based solely on Greentree's incumbency rather than the proposal's merits. Pl.'s Mot. at 27. However, Plaintiff fails to show the evaluators erred or that any error was prejudicial.

#### 1.   The Strength Awarded Under Factor 2, Subfactor 4 was Not Improper.

Under Factor 2, Subfactor 4, the evaluators assessed "the offeror's understanding and technical approach for managing resources to meet schedule and performance, to include post-award start-up actions." AR 546. Under this subfactor, the TEB's Consensus Report awarded Greentree a strength based on the following reasoning, quoting language from Greentree's "Post Award Start Up" plan in its proposal:

> Offeror's quote presented their knowledge and understanding of the requirement by presenting skill sets that are required to continue supporting these systems . . . "Our personnel and experience will allow us to successfully perform a transition to a new contract with no break in service."

AR 1756.

CSI challenges this strength by noting that one of the three preliminary individual evaluations referenced Greentree's incumbency. Evaluator William Sanders' individual TER awarded Subfactor 4 a strength and quoted the same portion of Greentree's proposal: "As the

incumbent contractor, Team Greentree knows what is required to continue supporting these systems. Our personnel and experience will allow us to successfully perform a transition to a new contract with no break in service." AR 1642. CSI claims this individual evaluation reflects improper "pro-incumbent bias" that the Agency papered over by keeping almost the same language in the Consensus Report and merely removing the reference to incumbency. Pl.'s Mot. at 27–28. But the Agency did not err.

First, as the Government points out, "[a] single TER . . . reflects one individual evaluator's evaluation." Def.'s Mot. at 13. Mr. Sanders' TER is dated January 30, 2024. AR 1631. Between February 6 and February 29, 2024, the evaluation team convened "to document the results of the entire technical evaluation process" by consensus and memorialized it in the Consensus Report, dated March 20, 2024. AR 1729. The CO's final award decision assessed the Consensus Report's technical evaluations—not the individual evaluations. AR 1719.

Second, the Consensus Report's analysis reflects that the Agency's consideration of incumbency was permissible. "[A]n agency may not unduly tip the scales in favor of an incumbent contractor." *Crowley*, 158 Fed. Cl. at 367. But "consideration of [Greentree's] incumbency does not, on its own, render [the] [A]gency's decision arbitrary or capricious" so long as the record demonstrates that GSA's rating "was based on the evaluation criteria . . . and supported by the contents" of Greentree's proposal. *Id.* at 367. "Just because [a] strength is not available to any other offeror does not render its assignment arbitrary or capricious." *Id.* at 370 (internal quotation omitted). An agency may "weigh the competitive advantages offered by that incumbent via its relevant experience and performance with the contract subject matter." *Gulf Grp., Inc. v. United States*, 56 Fed. Cl. 391, 398 (2003).

The record shows the Agency's consideration of incumbency was proper. The Consensus Report explained that Greentree's "quote presented their knowledge and understanding of the requirement by presenting skill sets that are required to continue supporting these systems." AR 1756. *Id.* This attribute is directly responsive to Subfactor 4's evaluation of post-award start-up actions. AR 546.

Recognizing this benefit of incumbency also reflects concerns in the PWS. The PWS required contractors to develop a "phase-in plan" that addressed "issues likely to result from non-incumbent contractor performance, and . . . . shall include a detailed plan-of-action" for contract transition. AR 589. As the incumbent, Greentree promised a transition with "no break in service." AR 1756. In crediting this fact, the Agency properly "weigh[ed] the competitive advantages offered by [Greentree's] . . . experience and performance." *Gulf Grp.*, 56 Fed. Cl. at 398. Other individual evaluators also assessed the proposal's merits in reference to the evaluation criteria. *See, e.g.*, AR 1626 (assessing a strength under Subfactor 4 because Greentree "[has] a solid plan for the future . . . as laid out in their strategy going forward" and "their training program . . . coincides with [Agency] strategy").

Thus, Plaintiff's challenge to this strength fails because "this strength explicitly reference[s] and connect[s] to the solicitation evaluation criteria . . . [and] is also based on the contents of [Greentree's] proposal." *Crowley*, 158 Fed. Cl. at 370. Accepting CSI's argument "would improperly penalize [Greentree] simply for the experience and familiarity with the agency [it] acquired as the incumbent contractor." *Galen Med. Assocs., Inc. v. United States*, 56 Fed. Cl. 104, 111 (2003), *aff'd*, 369 F.3d 1324 (Fed. Cir. 2004). GSA "was not required to neutralize the inherent competitive advantage gained by [Greentree] through its participation" in

the existing contract. *Samsara Inc. v. United States*, 169 Fed. Cl. 311, 322–23 (2024). Greentree apparently offered minimal transition risk and years of experience on the contract—"earned benefits of incumbency. . . to which an agency need not turn a blind eye in the award calculus." *Gulf Grp.*, 56 Fed. Cl. at 398. "[T]his strength directly correlates to the solicitation evaluation criteria and the contents of [Greentree's] proposal." *Crowley*, 158 Fed. Cl. at 370. Since GSA "has broad discretion to determine that [Greentree's] proposed approach offers a real advantage over other proposals," Plaintiff does not establish that the Agency erred. *Id.* at 371.

### 2.   The Strength Awarded Under Factor 2, Subfactor 1 was Not Improper.

The same principle applies to CSI's challenge to Factor 2, Subfactor 1. Under this subfactor, the Agency assessed whether the proposal "[d]emonstrates the offeror's ability to administer the support services and provide the staffing necessary to perform the work outlined in the PWS." AR 547 (RFQ's requirements). The Consensus Report awarded the following strength: "[Greentree] has a solid staffing plan as they have been the incumbent on this contract for the past 12 years." AR 1755.

CSI argues this "appears to be based on Greentree's incumbency" because it "does not address the content of Greentree's actual staffing plan beyond characterizing it as 'solid.'" Pl.'s Mot. at 27. The Government responds that the "strength does not simply state that Greentree is the incumbent." Def.'s Mot. at 12. Instead, the Government argues, the Consensus Report "identifies a 'solid staffing plan,'" which is the "basis for its rating[]." *Id.* The reference to Greentree's "past 12 years" of incumbency was, the Government avers, "the reason why Greentree had such a solid plan"—but should not detract from the analysis as "solid," which the Government argues is sufficient. *Id.*

Again, the record does not establish error. "The streamlined or 'minimum' documentation required by FAR subpart 8.4 does not mean that the agency can provide almost no rationale for the decisions made on the technical evaluation." *DigiFlight, Inc.*, 165 Fed. Cl. at 607. However, the Agency did not have to explain in exhaustive detail when it awarded a strength. *See Fox Television Stations, Inc.*, 556 U.S. at 513–14 ("[A] court is not to substitute its judgment for that of the agency . . . and should uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.") (cleaned up). The Consensus Report's finding of a solid staffing plan does—even if cursorily—"reference and connect to the solicitation evaluation criteria," which assessed the adequacy of the staffing plan. *Crowley*, 158 Fed. Cl. at 370.

As discussed above, consideration of incumbency is rational in reference to this evaluation factor. Greentree emphasized its incumbency in its staffing plan, which proposed utilizing 67 existing employees who were currently serving on the contract and highlighted their long tenures. AR 1281, 1283. This natural advantage—from twelve years of incumbency—are permissible for the agency to consider. *Omega World Travel*, 54 Fed. Cl. at 575. The evaluators were clearly aware of them. *See, e.g.*, AR 1755 (noting Greentree's "proposed key personnel . . . have years of relevant and current work experience"). Given that this subfactor evaluated an offeror's ability to provide the support and staffing necessary, the Agency rationally concluded that an incumbent's staffing plan maintaining many of the existing staff could be the basis for a strength. Greentree was "the incumbent contractor currently performing the services[,] and its proposal leveraged the benefits [it] could provide due to its incumbent experiences." *Crowley*, 158 Fed. Cl. at 369 n.6. This is all the more true because Subfactor 1's evaluation criteria stated

that immediate availability of personnel and a lack of breaks in service were important.  AR 547 ("All key personnel proposed shall be . . . available to begin work immediately on the project start date.").  Thus, although the Agency's explanation is brief, this is not a situation where it "provide[d] almost no rationale" for the strength.  *DigiFlight, Inc.*, 165 Fed. Cl. at 607.  The record permits the Court to reasonably discern GSA's decisional path.  *Fox Television Stations, Inc.*, 556 U.S. at 514.

However, even if this were an error, CSI does not demonstrate it is prejudicial.  The Consensus Report for Factor 2 awarded Greentree four strengths—including a separate strength under Subfactor 1.  AR 1755–56.  In contrast, CSI received only one strength, awarded under Subfactor 1.  AR 1737.  Even if Greentree's Subfactor 1 strength were erroneous, it would have received three strengths overall, compared to CSI's single strength.  There is no basis to find that Greentree would not have received an "Outstanding" rating based on these three strengths—especially given the deference accorded to technical evaluators' assessment of adjectival ratings.

## B.     Greentree's Description of its FTE Reductions Did Not Violate the RFQ.

CSI next objects to Greentree's description of a planned [***]-employee reduction in staff in the contract's option years.  CSI claims Greentree's presentation of this information in its Price Volume but not its Non-Price Volume was intentionally misleading and violated the RFQ's requirements to ensure "consistency" between volumes and to justify deviations from the current FTEs.  *See* Pl.'s Mot. at 22.  *See also* AR 542 (stating requirement to justify deviations), 547 (requiring staffing plan consistency), 550 (stating requirement to ensure price and technical volumes are consistent).  But the record does not reflect this.

Greentree proposed [***] full-time employees (FTEs) for the contract's base period in its Non-Price volume.  AR 1277, 1281.  Undisclosed in Greentree's Non-Price Volume—but disclosed in its Price Volume—was Greentree's plan to decrease the FTEs from [***] to [***] as an "adjustment for efficiencies as [Robotics Process Automation ("RPA")] is implemented and systems mature and move to the cloud, reducing some staff in the out years as a result of those efficiencies."  AR 1342.  Greentree provided pricing templates in the Price Volume that showed its proposed FTEs dropping from [***] to [***], [***], [***], and [***], respectively in the four option years of the contract.  AR 1350, 1353, 1357, 1361, 1365.  CSI argues that Greentree's failure to explicitly address the FTE reduction in the Non-Price Volume violated the RFQ's requirement to ensure consistency between the staffing plan and the price quote, as well as the requirement to justify deviations of 10% or more from 71 FTEs.  Pl.'s Mot. at 22.

Greentree did not violate these RFQ provisions.  First, the RFQ's requirement that "deviations +/- 10% must be addressed within the quote" does not require the information to appear in a particular volume.  AR 542.  *See also* Def.'s Mot. at 23.  This instruction is included under the "General Information" section of the RFQ, which uses the term "quote" to describe the entire submission by an offeror, not a specific volume.  AR 541–42.  Subsequent "Submission Instructions" describe a "quote" as consisting of both the Non-Price and Price Volumes.  AR 543.  Further, Greentree's Price Volume did not hide this information.  Its first substantive page includes a "Basis of Estimate" for the proposed FTEs.  AR 1342.  This basis explicitly stated that the price "includes adjustment for efficiencies . . . reducing some staff in the out years."  AR 1342.  Greentree's pricing templates clearly show the reductions.  AR 1350, 1353, 1357, 1361, 1365.

Second, Plaintiff does not explain why a Price Volume that acknowledges the Non-Price Volume's proposed [***] base year FTEs—and explicitly describes a reduction in the out years—fails the RFQ's consistency requirement. This is especially true given that Greentree was informed by the RFQ's instructions that pricing information would be shared with the technical evaluators. AR 550. An offeror, relying on these instructions, could reasonably expect its information about FTEs to reach the Non-Price evaluators. Further, "consistency" does not require that the volumes contain identical information—just consistent information. *See, e.g.*, *Consistency*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/consistency (last visited Sept. 13, 2024) (defining "Consistency" as "agreement or harmony of parts or features to one another" or more specifically the "ability to be asserted together without contradiction").

CSI claims that the Consensus Report's and CO's failure to mention the proposed FTE reduction is evidence that the volumes were inconsistent and Greentree "obfuscated" the facts. Pl.'s Mot. at 22. But since the RFQ stated the price information would be shared with technical evaluators, any omission in the evaluation is not itself conclusive evidence that Greentree violated the RFQ. And this fact would more properly support a challenge to the Agency's failure to assess this alleged discrepancy, *see infra* IV.C.2, rather than an accusation of obfuscation on Greentree's part. Finally, as Defendant points out, CSI's Non-Price Volume provided a list of staff by category but did not explicitly state it would provide [***] FTEs in the base year; an omission that could likewise be characterized as an obfuscation. AR 662–63. *See also* Def.'s Reply at 9 n.4. But neither Greentree's nor CSI's presentations were in error.

### C. The Agency's Analysis of Level of Effort was Ambiguous, but Any Error was Not Prejudicial.

Plaintiff challenges GSA's evaluation of Greentree's proposed FTEs on two grounds. First, CSI argues that the Agency had to conduct a detailed comparison of CSI's and Greentree's FTEs under Factor 2, Subfactor 1 and did not. Pl.'s Mot. at 17–19. Second, because the Agency did not explicitly address Greentree's proposed FTEs or its planned reduction, CSI argues its evaluation violated FAR 8.405-2(d) and the RFQ. *Id.* at 19–23. On the first, the Court finds the Agency did not err. On the second, while the record is too ambiguous to determine whether the Agency erred, any such error is not prejudicial.

#### 1. The RFQ Did Not Require a Detailed Comparative Analysis of Offerors' Proposed FTEs.

First, Plaintiff claims that Factor 2, Subfactor 1 required GSA to conduct a detailed comparative analysis of the differences between CSI's proposed [***] FTEs and Greentree's proposed [***]-to-[***] FTE reduction. Pl.'s Mot. at 17–18. That subfactor instructed GSA to "determine the degree to which the proposed management & staffing plan . . . demonstrates the offeror's ability to . . . provide the staffing necessary to perform the work" required. AR 546. Citing to nonbinding GAO caselaw, Plaintiff asserts that "[w]here a solicitation requires an agency to evaluate the 'extent' or 'degree' that a proposal meets a particular requirement, the solicitation requires a relative, comparative assessment." Pl.'s Mot. at 18 (citing *Evergreen JV*, B-418475.4, 2020 CPD ¶ 301 at 10 (Comp. Gen. Sept. 23, 2020)). The Subfactor 1 ratings for CSI and Greentree did not discuss the comparative differences between parties' proposed FTEs. AR 1737 (CSI's evaluation), 1755 (Greentree's evaluation). CSI argues this violated a purported comparison requirement. Pl.'s Mot. at 19–20.

Yet Plaintiff does not identify applicable authority to support its view that this subfactor required a comparative analysis. The authority on which it relies, *Evergreen JV*, is nonbinding and interprets the term "extent," which is not in the RFQ, rather than "degree." 2020 CPD ¶ 301 at 9. The facts are also distinct. There, the GAO found the agency incorrectly evaluated proposals on a "pass/fail" basis rather than providing qualitative reviews when the solicitation stated the agency would evaluate "the extent to which a proposal exceeds a requirement." *Id.* at 7–8 (internal quotations omitted). Thus, the agency in *Evergreen JV* erred by providing a "quantitative and mechanical comparison" of whether offerors met the minimum qualifications, when a qualitative one was required. Another GAO case Plaintiff cites, *CEdge Software Consultants, LLC*, similarly faulted the agency for not "qualitatively assess[ing] the proposed staffing plans beyond technical acceptability." B-418128.2, 202 CPD ¶ 127 at 5 (Comp. Gen. Mar. 19, 2020). Plaintiff's remaining case, *M7 Aerospace, LLC*, is also distinguishable because it relies on FAR 15's inapplicable documentation requirements. B-411986, 2016 CPD ¶ 100 at 4 (Comp. Gen. Dec. 1, 2015). And to the extent *M7* required any comparison, it was "a comparative assessment of proposals against all source selection criteria in the solicitation," rather than against the other offerors. *Id.*

In the instant case, the nature of GSA's Factor 2, Subfactor 1 evaluation—and all the technical evaluations—was "to make a qualitative assessment," which avoids the error in *Evergreen JV* and *CEdge*. *Evergreen JV*, 2020 CPD ¶ 301 at 5, 8; *CEdge*, 202 CPD ¶ 127 at 5. Under the subfactors, the Consensus Report awarded qualitative strengths, meets, and weaknesses based on specific elements of the proposals. *See generally* AR 1728–55. *Evergreen JV* did not even mandate a comparative analysis between offerors. Comparison was merely one example of the kinds of qualitative assessments the agency could consider. *See Evergreen JV*, 2020 CPD ¶ 301 at 12. And *CEdge* does not apply here because it reviewed an agency's finding that two offerors' staffing plans were "technically equal." 202 CPD ¶ 127 at 5. Here, Greentree's and CSI's Factor 2, Subfactor 1 evaluations received different strengths and ratings. AR 1769.

The RFQ's language and the approach taken in other subfactor evaluations containing the term "degree" also contradicts CSI's interpretation. The "degree" language appears in the Factor 1 evaluation criteria, where it references the specific individual offeror, not multiple offerors. AR 545 ("The Government will . . . assess the degree the offeror understands and can perform [the tasks]"), 546 ("The Government will assess the degree to which the offeror" addresses several subfactors). This close pairing indicates "degree" means the relative amount that the offeror at issue met, surpassed, or failed to satisfy the tasks set out in the PWS—rather than as compared to its competitors.

The individual evaluations and the Consensus Report followed that instruction. Each evaluation was conducted independently of the other offerors, and each subfactor was evaluated independently. AR 1729–55. The subfactor evaluations compared the proposal against the needs of the PWS—not other offerors' proposals. Plaintiff's own Factor 1 and Factor 2 individual evaluations and Consensus Report evaluations provide qualitative feedback against

the baseline of the RFQ but largely lack comparison to other offerors' plans.[2]  AR 1545–71 (individual evaluations), 1733–40 (Consensus Report evaluation).  So do all the other offerors' evaluations.  AR 1759–67 ([***]'s evaluations), 1741–49 ([***]'s evaluations).  Since the record does not otherwise establish the RFQ required a detailed comparative analysis, the Agency did not err.

2.  <u>The Record is Unclear as to Whether the Agency Properly Considered Greentree's FTEs.</u>

CSI further argues that the Agency violated the RFQ and the FAR because neither the CO's award decision, the Consensus Report, nor the individual technical evaluations explicitly discussed Greentree's proposed baseline FTEs or its planned reduction.  Pl.'s Mot. at 19–20.  *See also* AR 1709–27 (CO's decision), 1751–58 (Consensus Report evaluation), 1620–46 (individual evaluations).  The Government responds that the Agency did so at a general but still sufficient level of detail.  While the Court finds the Agency's analysis of Greentree's FTEs is ambiguous, it also finds Plaintiff fails to establish "significant prejudice" based on evidence in the record.  *Bannum, Inc. v. United States*, 404 F.3d 1346, 1353 (Fed. Cir. 2005).

a.  <u>The Requirement to Consider Level of Effort</u>

Plaintiff locates this purported requirement to address Greentree's proposed FTEs in RFQ and FAR provisions that use the term "level of effort."  Pl.'s Mot. at 17–20.  CSI asserts that level of effort is "generally understood" as "the amount of work to be performed by specified classes of employees over a given period of time, expressed in terms of labor-hours, labor-years, or other similar unit of measure."  Pl.'s Reply at 7 n.4.  CSI points to multiple RFQ and FAR provisions it claims require an FTE analysis.  Factor 2, Subfactor 1 assessed the "degree to which" an offeror had the "ability to . . . provide the staffing necessary."  AR 546.  Factor 2, Subfactor 5.1 instructed offerors to ensure "consistency in the level of effort between the project staffing plan provided and the price quote."  AR 547.  The RFQ's instructions stated that technical evaluators would "determine if pricing is reasonably aligned with the proposed labor mix to perform the duties as required by the PWS."  AR 550.  Factor 2, Subfactor 5.2 further required offerors to describe their "rationale for the proposed labor mix and level of effort to support each task."  AR 547.  Finally, FAR 8.405-2(d) states that an agency "is responsible for considering the level of effort and the mix of labor proposed to perform a specific task being ordered."  FAR 8.405-2(d).

In response, the Government acknowledges that FAR 8.405-2(d) applies but asserts that level of effort "refer[s] to an offeror's staffing approach."  Def.'s Mot. at 17.  It argues that GSA's more generalized review of staffing approach was sufficient to consider level of effort given the minimal documentation requirements for FAR 8.4 procurements.  Def.'s Mot. at 19 (citing FAR 8.405-2(d)).

---

[2]     A single evaluator's assessment of CSI (out of the total thirteen evaluations) mentions Greentree four times, although only one is a reference to Greentree's proposal.  AR 1577.  The other three refer to CSI's own proposal, detailing steps it has taken to identify Greentree employees who would commit to working with CSI.  AR 1577, 1579.  And the individual evaluations are not dispositive of the Agency's evaluation.  *See, supra* IV.A.1.

Caselaw interpreting FAR 8.405-2(d) and "level of effort" in FAR 8.4 procurements indicates the term is different from "staffing plan." Instead, this Court has often found the term refers to the quantity of FTEs or labor hours proposed by an offeror. *See, e.g.*, *Eagle Hill Consulting, LLC v. United States*, 171 Fed. Cl. 115, 135–36 (2024) (comparing "level of effort" to the Agency's "estimate for personnel quantity" in FAR 8.4 procurement); *PricewaterhouseCoopers Pub. Sector, LLP v. United States*, 126 Fed. Cl. 328, 358 (2016) (finding agency "had to consider the mix of labor categories and hours proposed by each offeror, including key and non-key personnel labor categories" when considering level of effort); *Harmonia Holdings Grp., LLC v. United States*, 136 Fed. Cl. 298, 308 (2018) (treating level of effort as measuring the number of "full-time equivalents, or . . . labor hours"). The RFQ confirms this understanding. In explaining that proposals were not required to quote at the existing 71 FTEs, the RFQ described "deviation" from that number as "proposing a different level of effort." AR 542.

That said, this does not mean that FAR 8.405-2(d) or the RFQ required the Agency to explicitly refer to FTE numbers. First, many RFQ provisions regarding level of effort are requirements that the offerors must satisfy, not explanatory requirements for the Agency. AR 547 ("The offeror shall ensure there is consistency in the level of effort . . . . [and] describe its rationale for the proposed labor mix and level of effort . . . ."). *See also* Def.'s Reply at 7. Further, Factor 2, Subfactor 1's evaluation of whether offerors "provide the staffing necessary" does not require explicit discussion of FTEs because, as Plaintiff avers, staffing and level of effort are not the same. And while the Government agrees that FAR 8.405-2(d) required the Agency to "consider" level of effort, Def.'s Mot. at 19, neither the FAR nor the RFQ specify "the depth of the necessary inquiry." *PricewaterhouseCoopers*, 126 Fed. Cl. at 358.

Plaintiff does not offer caselaw establishing a higher level of specificity is required. This Court has found that specific references to hours or FTEs satisfy FAR 8.405-2(d) and RFQ instructions to consider level of effort. *See, e.g.*, *DigiFlight, Inc.*, 165 Fed. Cl. at 603 (treating agency's consideration of "the number of hours proposed to conduct a task" as analysis of level of effort in the context of a FAR 8.4 procurement's price realism analysis). But it has also found that more general analyses can suffice, too.

In *Trillion ERP v. United States*, the Court found an agency "adequately considered [an offeror's] level of effort and labor mix" when it awarded strengths under a technical evaluation of a management and staffing plan. 161 Fed. Cl. at 551 (cleaned up). There, the agency highlighted more general elements of an offeror's proposal, like its plan "to split resources with key personnel to support multiple work streams"—an analysis that did not mention FTEs or hours. *Id.* at 552. The Court separately found the agency "also analyzed . . . levels of effort and labor mixes" in its price factor evaluation by "conduct[ing] a full-time employee equivalence analysis of the quoters' pricing submissions." *Id.* *See also PricewaterhouseCoopers*, 126 Fed. Cl. at 358–59 (finding an agency addressed level of effort both with general statements that the offeror's "mix and balance of projected labor hours, education, training, and experience" was "appropriate"—and by "additionally . . . not[ing] . . . key personnel . . . total to about [redacted] FTEs worth of work") (second alteration in original); *Telos Corp. v. United States*, 129 Fed. Cl. 573, 578 (2016) (finding agency's statement that an awardee proposed "adequate labor categories and labor mix" addressed level of effort).

Therefore, although explicit references to FTEs may be useful, they are not necessary to satisfy this RFQ and FAR 8.405-2(d).

> b.  The Agency's Evaluation of Level of Effort is Ambiguous.

Even assuming a more general analysis satisfies GSA's obligation to consider level of effort, the record is ambiguous as to whether GSA did so.

There is some evidence the Agency recognized and approved of Greentree's FTE numbers.  Greentree's Non-Price volume was explicit that it proposed [***] FTEs in the base year.  AR 1261, 1277 (contract management description noting [***] FTEs), 1281 (Management & Staffing plan listing [***] FTEs), 1308–22 (Key Personnel and non-key personnel matrices).  The Agency's technical evaluation under Factor 2 expressed overwhelming approval for the content of Greentree's proposed staffing, division of labor, team structure, and personnel categories in terms that resemble *Trillion ERP*, *PricewaterhouseCoopers*, and *Telos Corp.*  For example, the Consensus Report's Factor 2 Overall Evaluation Summary stated:

> [Greentree's] quote indicates an exceptional approach and understanding of SAF/FMFSO AFFSO's management and staffing needs . . . .  The offeror has an excellent grasp of the skill sets needed to successfully accomplish the tasks called for by the PWS.  Addressed staffing requirements by proposing highly effective personnel by role, education, experience, and required certifications.

AR 1755.

GSA also found the staffing plan "solid" under Factor 2, Subfactor 1.  *Id.*  Similarly, the Consensus Report reproduced a division of labor chart from Greentree's "Project Staffing Plan," listing separate teams with numbers of FTEs corresponding to its proposed labor categories:

[***]

*Id.* (reproducing chart at AR 1283).

Citing this chart, the Agency stated the proposal "addresses all PWS elements for this section"—suggesting approval of the FTEs and labor mix contained in the chart.  Under Factor 2, Subfactor 5.1, it cited this chart again, noting Greentree meets this requirement because its proposal:

> [p]rovided a staffing plan, very comprehensive, that aligns with all tasks in the PWS.  Key personnel, and non-key personnel throughout the Staffing Plan, and a solid approach for attaining and retaining personnel will assist the AFFSO to continue operation in a smooth and efficient manner . . . .

AR 1756.

The Consensus Report found that Greentree met Subfactor 5.2's requirement to "describe its rationale for the proposed . . . level of effort" and cited to the following portion of Greentree's proposal:

> [Greentree is] [p]roposing our current committed and fully qualified and trained staff . . . the proper labor mix . . . as determined by customer's focus areas . . . all personnel listed are exceptionally qualified . . . .  we have ensured expert continuity of operations . . . by

17

identifying knowledge, skills, and abilities for professionals across multiple PWS objectives.

AR 1757 (citing AR 1283).

The Agency also awarded a second strength under Factor 2, Subfactor 1.  Citing to the "Robotic Process Automation" section of Greentree's Factor 1 submission, the Agency recognized Greentree's proposed plan to save "Hours and Dollars" by "avoiding manual processes."  AR 1755.  The cited section explains how Greentree used RPA on its existing contract to achieve "total cost avoidance" of [***] and save [***] "total automation hours."  AR 1272, 1274.  Efficiency gains from RPA was also the explanation Greentree provided for its proposed FTE cuts.  AR 1342.  The Agency's recognition of a similar strategy suggests—but does not confirm—that it was aware of the proposed FTE reductions.

These approving statements resemble the holistic references to division of labor, experience, personnel mix, and staffing found sufficient to consider level of effort in other cases.  *Cf. Trillion ERP*, 161 Fed. Cl. at 552; *PricewaterhouseCoopers*, 126 Fed. Cl. at 358–59.  In FAR 8.4 procurements, "when an agency finds aspects of a protester's proposal to be adequate," it need not explain every decision "for the award decision to be rational."  *Telos Corp.*, 129 Fed. Cl. at 577.  Presuming that the Agency acted in a rational manner, *Med. Dev. Int'l*, 89 Fed. Cl. at 702, it is reasonable to infer that GSA recognized and considered Greentree's FTEs.

However, some provisions GSA cites are at odds with the Government's contention that it was aware of the actual number of proposed FTEs.  First, under Subfactor 5.1, GSA relied on the fact that Greentree will "retain current staff [as] noted in Letters of Commitment" to find that it met the requirement.  AR 1756.  Second, Greentree's Project Staffing Rationale, cited by the Agency under Subfactor 5.2, also proposed "our current committed and fully qualified staff."  AR 1283.  But Greentree did not propose the "current" staff, which was 71 FTEs.  It proposed [***] FTEs and fewer in the option years.

In evaluating every other offeror, the Consensus Report treated "current staff" as referring to 71 FTEs.  *See, e.g.*, AR 1737 (noting CSI's proposal meets the requirements by "address[ing] all 71 current positions currently on our current contract"), 1746 (noting same for [***] because its proposal "addresses [***] positions[,] which is one less than our current manning on the contract"), 1764 (explaining [***]'s proposal "addresses all 71 current positions currently on our current contract").  The evaluators may well have intended to recognize that [***] of Greentree's proposed [***] FTEs would be drawn from current staff.  But GSA's highlighting of the "current" FTE numbers at best makes this inference ambiguous, and at worst, contradicts it.

Third, the Project Staffing Plan chart's numbers do not add up to [***], but [***] in total.  AR 1755.  This inconsistency is unexplained by either Intervenor or the Government, adding ambiguity as to what exactly the Agency was approving.  Fourth, GSA's reliance on the [***]-FTE chart or the 71-FTE current staff raises questions about whether it was aware of the planned FTE reductions.  Intervenor asserts that the decreases were obvious in its Non-Price Volume because it proposed "efficienc[ies]" that "directly correlate to a lower proposed cost as identified in the Price Volume."  Def.-Intervenor's Mot. at 9.  But the record sections cited do not discuss staff reductions.  *See, e.g.*, AR 1266, 1268, 1270.  Similarly, the evaluators' reference to labor reductions from automation cites to Greentree's Factor 1 proposal—not its Price Volume, which

contained the information on reductions.  AR 1755.  And the overall issue is not whether the proposal contained information implying FTE reductions, but whether there is record evidence that the Agency considered them.

Usually, challenges to "the minutiae of the procurement process in such matters as technical ratings . . . involve discretionary determinations of procurement officials that a court will not second guess."  *E.W. Bliss*, 77 F.3d at 449.  And FAR 8.4 requires "minimal documentation."  *DigiFlight, Inc.*, 165 Fed. Cl. at 601.  The Agency offered effusive praise for aspects of Greentree's plan, but GSA's comments on the staffing chart and "current" staff inject ambiguity as to precisely what it considered that plan to be.  "An agency must explain its action with sufficient clarity to permit 'effective judicial review.'"  *DigiFlight, Inc.*, 165 Fed. Cl. at 609 (quoting *Timken U.S. Corp. v. United States*, 421 F.3d 1350, 1355 (Fed. Cir. 2005)).  The Court cannot find from this ambiguous record that the Agency has "provid[ed] a coherent and reasonable explanation" of its analysis of level of effort.  *Centech Grp., Inc.*, 554 F.3d at 1037.

3.   Plaintiff Does Not Establish Prejudice.

Even if GSA's level of effort analysis erred, Plaintiff does not establish that the error caused "significant prejudice."  *Bannum,* 404 F.3d at 1353.  "To establish that it has suffered a prejudicial error in a post-award protest, a plaintiff is 'required to show that there was a substantial chance it would have received the contract award but for the [agency's] errors in the bid process.'"  *DigiFlight, Inc.*, 165 Fed. Cl. at 597 (quoting *Bannum*, 404 F.3d at 1358).  "Prejudice is a question of fact," and a finding must be made from the record evidence.  *Off. Design Grp. v. United States*, 951 F.3d 1366, 1374 (Fed. Cir. 2020).  While the test is "more lenient than showing actual causation," it still requires a basis in evidence rather than mere conjecture or possibility.  *Bannum*, 404 F.3d at 1358.  "The burden to demonstrate prejudicial error . . . lies squarely on the plaintiff."  *Superior Waste Mgmt. LLC v. United States*, 169 Fed. Cl. 239, 288 (2024).

CSI claims prejudice for two reasons.  First, CSI argues an analysis that accounted for Greentree's FTEs would have downgraded Greentree's Factor 2 ratings because the Agency would have viewed any FTEs fewer than the current 71 employees as a weakness.  Pl.'s Mot. at 21.  Second, CSI suggests that the CO's Price Review—which compared offerors' total prices but not the underlying FTEs or labor hours—was compromised because GSA did not recognize Greentree's "lower price was driven by its strategy to slash staffing in out-years."  Pl.'s Reply at 6.  For the reasons below, Plaintiff's arguments fall short.

a.   Plaintiff Does Not Establish Prejudice in the Factor 2 Evaluation.

Plaintiff argues that if the Agency had extensively considered Greentree's level of effort, "Greentree would have been downgraded under Factor 2, or alternatively, GSA's assessment of CSI's proposal would have improved significantly relative to Greentree's proposal."  Pl.'s Mot. at 23.  CSI must show "there is a greater-than-insignificant chance that [GSA] would have" increased CSI's Factor 2 ratings or decreased Greentree's "had it not committed the . . . errors." *Am. Relocation Connections, L.L.C. v. United States*, 789 F. App'x 221, 228 (Fed. Cir. 2019). The record evidence does not support this conclusion.

First, "[t]he solicitation did not require offerors to propose a minimum number of FTE[s]."  *A-T Sols., Inc. v. United States*, 122 Fed. Cl. 170, 179 (2015).  While the RFQ required

offerors to justify 10% deviations from the existing 71 FTEs, it does not follow that the agency had to rate proposals weaker or stronger based on any deviations. *See, e.g.*, *Centerra Grp., LLC v. United States*, 135 Fed. Cl. 587, 605 (2017) (finding agency "was not obligated to compare [offeror's] staffing plan to the existing level of staffing" when RFQ did not explicitly require it). Nor does it guarantee, as CSI claims, that "exceeding the . . . requirements [would have] garner[ed] a more favorable evaluation" for CSI. Pl.'s Mot. at 18 (citing *Evergreen JV*, 2020 CPD ¶ 301 at 10). The RFQ in fact makes clear the opposite is true. It explained that the 71 FTE staffing level was "provided for informational purposes only and is not a requirement for contractors to quote at these funding levels." AR 542. "Proposing a different level of effort [was] determined by the contractor's technical approach," leaving the proposed FTEs to the contractor's discretion. AR 542. The RFQ therefore does not support the contention that CSI's proposal, which offered [***] FTEs, should have been rated higher than Greentree's because it equaled or exceeded the existing FTEs.

This is reflected in the record of the Agency's Factor 2 analyses, which more explicitly addressed the other offerors' proposed FTEs. [***] and [***] proposed [***] and [***] FTEs respectively, mirroring or closely mirroring the current level of effort. AR 1746 ([***]'s evaluation), 1764 ([***]'s evaluation). GSA found those numbers warranted only a meets under Factor 2, Subfactor 1—not a strength. *Id.* Similarly, the Consensus Report considered CSI's [***] FTEs but did not reward it for exceeding the existing FTEs. CSI's staffing plan included a list of personnel that, when totaled, equals [***] FTEs. AR 663. The Consensus Report recognized this fact, as it cited this section as evidence that CSI "address[ed] all 71 current positions." AR 1737. But it also cited this fact to support a meets instead of a strength. AR 1737. Thus, the record reflects that the Agency considered CSI's number of FTEs and determined it did not warrant an additional strength.

While GSA did award CSI a strength under the same subfactor, the Consensus Report reflects that retention of incumbent personnel and a smooth transition—rather than overall number of FTEs—was important to the Agency. AR 1737 (awarding strength in part for "maintain[ing] close to 90% of the current workforce which ensures a smooth transition," "research on the activities in the office," and "discussion with existing personnel on the current contract"). AR 1737. The same is true for [***]'s evaluation, which also noted concerns about "retaining incumbent personnel as much as possible . . . to ensure the AFFSO continues operations in a smooth and timely manner." AR 1746. This focus on a smooth transition is consistent with the Agency's decision to award Greentree strengths in part based on minimizing transition risk. AR 1756. *See also supra* IV.A.1. Finally, the IGCE's FTE estimate was 69.6. AR 1720. Given that CSI's proposed FTEs were more than the IGCE's estimate, it does not follow that CSI would have received a stronger rating.

Second, the RFQ and the evaluation record do not establish that the Agency would have reduced Greentree's ratings. Instead, the record suggests the opposite. The Agency encouraged proposals that would reduce staffing hours or prices, and thus cost. This was a firm fixed price contract, based on labor rates for positions as contained in the Federal Supply Schedule. AR 416, 541. The Pricing Template was based on three Contract Line Item Numbers ("CLINs"): Other Direct Costs ("ODCs"), Travel, and Labor (representing proposed FTEs and labor rates). AR 532. The Price Evaluation criteria stated that Travel and ODCs would be fixed on all proposals, but noted that "[c]ontractors are encouraged to provide price discounts." *Id.* This language suggests that the Agency intended price discounts to come from the offerors' staffing

plans. AR 550. One way to provide price discounts was to under-bid the FSS' labor rates, which all parties did, noting their discounts in a "% Discount" column. AR 783–798, 1147–52, 1343–67, 1511–1530. But another way to provide price discounts was to reduce staffing hours or FTEs. Given that labor and staffing was the primary price driver, nothing in the record suggests that the Agency would have penalized Greentree for FTE reductions when it appears to have encouraged offerors to do so.

The fact that the Agency rewarded Greentree for proposing cost savings from RPA-related labor hour reductions under the staffing plan analysis further indicates it would have viewed proposed staff reductions as a positive, not a negative. For its Factor 2, Subfactor 1 strength, the Consensus Report highlighted Greentree's proposed "RPA savings in Hours and Dollars in avoiding manual processes" and cited to the "RPA" section of Greentree's proposal. AR 1775. The cited portion described other projects in which RPA achieved labor hour savings. AR 1274 (noting one project where automation resulted in "saving hundreds of man-hours annually," and another that "reduce[d] processing time 70% . . . 107 hours saved"). The section the Consensus Report cites closes by explaining that Greentree intended to expand its RPA use if awarded the contract. *Id.* (stating Greentree's "[f]uture [i]nitiatives" would "[e]xplore RPA tools . . . that will provide the same and/or more benefits for financial savings"). Although this information was included in the Factor 1 section of Greentree's proposal, the Consensus Report's award of a strength under Factor 2 makes clear the Agency viewed labor hour savings from RPA as a staffing benefit. Thus, rather than considering reductions in FTEs or hours problematic, the Agency appeared to treat it as a substantial potential advantage.

Significantly, this same strategy of labor hour savings through RPA is precisely the explanation Greentree provided for its [***]-to-[***] FTE reduction in the Price Volume. Greentree stated that its "price includes adjustment for efficiencies as RPA is implemented and systems mature and move to the cloud, reducing some staff in the out years as a result of those efficiencies." AR 1342. This explanation matches the strategy of using "RPA [for] savings in Hours and Dollars in avoiding manual processes" explicitly rewarded by the Agency. AR 1755. It also reflects Greentree's commitment to implementing expanded RPA usage—one of the "detailed examples" cited approvingly by the Consensus Report. *Id.* (citing AR 1274).

CSI does not counter the Agency's explicit praise for RPA-related savings. It points to no evidence suggesting that Greentree would have been downgraded under Factor 2 if the Agency had more explicitly considered its RPA-based FTE reduction plan in the Price Volume. Pl.'s Mot. at 21–22. Comparing Greentree's proposed RPA gains in the technical quote against the explanation in the Price Volume would also tend to demonstrate that the level of effort is "consistent" between the two volumes as required by Subfactor 2, Factor 5.1. AR 547 (consistency requirement).

CSI's claim that a more fulsome level of effort analysis would have changed the Agency's staffing calculation is "conjecture" that lacks evidentiary support in the record. *Bannum*, 404 F.3d at 1358. While the Agency might have done so, mere possibility cannot support a finding of prejudice, especially when the evidentiary record proves otherwise. *Id.* at 1358. Thus, Plaintiff "has failed to carry its burden" to show that the Agency's somewhat ambiguous analysis was prejudicial error. *Superior Waste Mgmt.*, 169 Fed. Cl. at 288.

b. The Agency's Price Analysis was Sufficient.

Plaintiff also fails to demonstrate error in the CO's price analysis. CSI is correct that the CO's Price Review did not explicitly address each offeror's level of effort. Pl.'s Mot. at 13; AR 1720–21. CSI claims that the price analysis is tainted because the record does not "demonstrate[] the Agency's awareness of Greentree's proposed staffing cuts." Pl.'s Mot. at 23. However, Plaintiff fails to establish an error.

FAR 8.405-2(d) requires a price reasonableness analysis. *See* FAR 8.405-2(d) (stating an agency "is responsible . . . for determining that the total price is reasonable"). *See also Distributed Sols.*, 106 Fed. Cl. at 21–22 (finding FAR 8.405-2(d) requires a price reasonableness analysis instead of a price realism analysis); FAR 8.405-2(f) (explaining agencies must "document . . . [t]he price reasonableness determination required by" FAR 8.405-2(d)). The RFQ did not require a price realism analysis. AR 541–69 (RFQ failing to discuss realism).

"One way to determine price reasonableness" under FAR 8.405-2(d) "is to compare the quoters' price proposals to the IGCE." *Distributed Sols.*, 106 Fed. Cl. at 21–22. *See also Holloway & Co., PLLC v. United States*, 87 Fed. Cl. 381, 395 (2009). This is because "[p]rice reasonableness generally addresses whether a price is too high." *Distributed Sols.*, 106 Fed. Cl. at 21 (quoting *First Enter. v. United States*, 61 Fed. Cl. 109, 123 (2004)). In contrast, price realism generally "concerns proposed prices that are too low." *Tech Sys.*, 98 Fed. Cl. at 264. *See also Holloway*, 87 Fed. Cl. at 393 (explaining price realism "seeks to prevent acceptance of an unrealistically low price") (internal quotations omitted).

Some Court of Federal Claims and nonbinding GAO decisions have noted an agency's consideration of FTEs or level of effort during a FAR 8.4 price analysis. *See, e.g.*, *Niksoft Sys. Corp.*, B-406179, 2012 CPD ¶ 104, at 5 (Comp. Gen. Feb. 29, 2012). But most cases that do so are in the context of price realism, not price reasonableness. *See, e.g.*, *DigiFlight, Inc.*, 165 Fed. Cl. at 603, 610; *Agile-Bot II, LLC v. United States*, 156 Fed. Cl. 180, 218 (2021). Others did so when the RFQ, not FAR 8.4, required the agency to evaluate level of effort to identify specific pricing issues, like unbalanced pricing. *See, e.g.*, *Harmonia Holdings Grp.*, 136 Fed. Cl. at 303 (assessing level of effort as part of price when RFQ stated "the price quotations were to be evaluated for realism . . . and unbalanced pricing"); *Ernst & Young, LLP v. United States*, 136 Fed. Cl. 475, 489 (2018). Here, the RFQ only required GSA to evaluate for reasonableness. In noting that price information was to "be shared with the technical evaluators to determine if pricing is reasonably aligned with the proposed labor mix," the RFQ indicates any failure to assess level of effort would be an error in the technical evaluation—which the Court finds nonprejudicial—rather than the price evaluation. AR 550.

More importantly, cases interpreting FAR 8.405-2(d) indicate that even if an analysis of FTEs may be an element of a satisfactory price reasonableness determination, it is not a necessary one. *See, e.g.*, *Distributed Sols.*, 106 Fed. Cl. at 21–22 (emphasizing only price comparison and not addressing FTEs or level of effort); *22nd Century Techs., Inc.*, 2021 WL 3856038, at *12–13 (same); *Metro. Interpreters & Translators, Inc. v. United States*, 145 Fed. Cl. 495, 513 (2019) (upholding agency's reasonableness determination without reference to hours or FTEs); *Tesla Lab'ys, Inc. v. United States*, No. 24-462, 2024 WL 3823538, at *20 (Fed. Cl. July 31, 2024) (finding challenges to labor mix were a possible basis—but not the only basis—for a price challenge). Indeed, cases evaluating a FAR 8.405-2(d) price reasonableness analysis often rely on FAR 15.404-1(b) for guidance. *See, e.g.*, *Trillion ERP*, 161 Fed. Cl. at 553; *Distributed Sols.*, 106 Fed. Cl. at 22. That provision states the Government "may use

various price analysis techniques and procedures" to determine price reasonableness that "include, but are not limited to . . .  comparison of proposed prices with independent Government cost estimates."  FAR 15.404-1(b).

Here, the Agency conducted a proper price reasonableness analysis by "compar[ing] the quoters' price proposals to the IGCE."  *Distributed Sols.*, 106 Fed. Cl. at 22.  First, the CO noted that all price proposals fell below the IGCE of $79,880,481.86.  AR 1720–21.  She stated that the "vendors' proposed rates and prices" were "competitively solicited" and were "equal to or less than the rates in the vendor's Multiple Award Schedule, Information Technology / Professional Services contract . . . which are determined to be fair and reasonable per FAR 8.405-2(d)."  AR 1720.  She further observed that "pricing details are included in each vendor's quote."  *Id.* Second, the CO reproduced each offeror's price, and noted the percentage that each were "LOWER THAN" the IGCE.  AR 1721.

Additionally, although the CO's "Price Preview" was brief, there is some record evidence to suggest the CO did analyze level of effort.  The CO "reviewed" the quoted prices and "found [them] to comply with the rates and prices in their respect[ive] GSA Multiple Award Schedules"—indicating the CO reviewed the offerors' labor rates.  AR 1720.  The record also states that as part of the technical evaluation process, the CO "reviewed the price quotes"— quotes that clearly showed the offerors' proposed FTEs.  AR 1719.  Since this was not a price realism analysis, the Agency was not obligated to treat the fact that Greentree's price was the lowest as presumptively problematic.  *DynCorp Int'l, LLC v. United States*, 10 F.4th 1300, 1311 (Fed. Cir. 2021) (holding that "the point of a price-reasonableness analysis is to protect the public from paying a price that is too high for what is being procured," not that it is too low).  Even though the proposed FTE cuts made Greentree's price "far below" the IGCE, GSA only needed to evaluate proposals for reasonableness.  Pl.'s Mot. at 23.  And CSI does not challenge Greentree's overall price as unreasonable.  It challenges the failure to consider level of effort. Pl.'s Mot. at 17–21; Pl.'s Reply at 6–9.

In sum, "contracting agencies enjoy wide latitude" in conducting a price reasonableness analysis.  *DynCorp Int'l,* 10 F.4th at 1311.  The record shows that the CO compared the prices to the IGCE after finding the rates otherwise fair and reasonable.  Thus, Plaintiff does not establish that the price analysis was erroneous.

> **D.    The Technical Ratings Do Not Contain Discrepancies or Documentation Failures that Compromise the Award.**

Plaintiff makes two more challenges to the technical ratings.  First, CSI claims the Consensus Report is unevenly documented and challenges three specific subfactor ratings as inconsistent.  Pl.'s Mot. at 24–25.  Second, Plaintiff asserts that the ratings system is not sufficiently explained.  *Id.* at 26.  However, because an agency's technical evaluation is an "inherently judgmental process requiring deference," *Galen Med. Assoc.*, 369 F.3d at 1339, and the record supports the ratings, Plaintiff fails on both points.

> 1.    The Challenged Ratings Are Not in Error.

Plaintiff challenges CSI's and Greentree's ratings under three subfactors: Factor 1, Subfactor 3; Factor 1, Subfactor 4; and Factor 2, Subfactor 6.

a.   <u>Factor 1, Subfactors 3 and 4</u>

For Factor 1, Subfactor 3, CSI received a "Good" rating based on one strength and zero weaknesses.  AR 1734–35, 1769.  Greentree received four strengths and four weaknesses, and it was rated "Outstanding."  AR 1752–53, 1769.  Similarly, for Subfactor 4, CSI received an "Acceptable" based on zero strengths and weaknesses while Greentree received an "Outstanding" based on one strength and two weaknesses.  AR 1735, 1753, 1769.  CSI claims these ratings are inconsistent and thus arbitrary.  But challenges to these subfactors lack merit.

The RFQ does not mandate how strengths, meets, and weaknesses must combine to generate a subfactor rating.  AR 551–52.  This is because, as Plaintiff acknowledges, "agencies do not assess ratings based on a mechanical count of strengths and weaknesses." Pl.'s Mot. at 25.  Procurement law is clear that an agency may choose to attribute different weights to different strengths and weaknesses.  *See, e.g.*, *EFW, Inc. v. United States*, 148 Fed. Cl. 396, 409 (2020) ("[C]ommon sense counsels that some strengths are more important, and some weaknesses pose greater risks."); *Tetra Tech, Inc. v. United States*, 137 Fed. Cl. 367, 386 (2017) (finding agency officials have "broad discretion to weigh an offeror's strengths and weaknesses as [they] see[ ] fit").

Given that the definition for "Outstanding" stated that "[s]trengths far outweigh any weaknesses," Plaintiff does not establish that the Agency could not rate Greentree's four strengths as outweighing the four weaknesses under Subfactor 3.  AR 552.  This is especially true given the significant strengths awarded to Greentree.  *See, e.g.*, AR 1752 ("Offeror brings a wealth of knowledge . . . ensures a continued improvement approach . . . solid record of support.").  The same principle applies to Greentree's single strength under Subfactor 4. Although weaknesses outnumbered this strength, those weaknesses were for failing to address certain PWS sections.  AR 1753.  The single strength was a full paragraph explaining multiple substantive benefits of Greentree's proposal.  *Id.*  Given that officials had discretion to weigh this strength as they saw fit, CSI does not establish the Consensus Report's technical ratings for these subfactors were in error.  *EFW, Inc.*, 148 Fed. Cl. at 409; *see also Tetra Tech, Inc.*, 137 Fed. Cl. at 386.

b.   <u>Factor 2, Subfactor 6</u>

Similarly, Plaintiff challenges Factor 2, Subfactor 6, which evaluated the parties' "Post Award Start-Up Plan."  The requirement stated:

> [t]he offeror shall provide a description of the timelines/schedule of activities and management following the award of an order.  The plan shall consist of the identification of key personnel and milestones of major activities necessary to start up the performance of the order.

AR 548.

The Agency assessed no strengths or weaknesses under this subfactor for either CSI or Greentree, merely finding that both proposals "meet" the requirements because the "[technical quote] addresses all PWS elements for this section."  AR 1739, 1757.  The Consensus Report cited relevant provisions of both proposals.  *Id.*  GSA rated CSI "Acceptable," even though Greentree received an "Outstanding" rating.  AR 1769.  Plaintiff argues this difference in ratings

is inexplicable and argues that the Agency's failure to explain it "deprives the Court of the ability to meaningfully review" the decision. Pl.'s Mot. at 25.

This is not the case. First, Plaintiff's "Acceptable" rating is consistent with the RFQ and the record. Plaintiff claims the analysis had "no meaningful information at all." Pl.'s Mot. at 24. But the Agency cited to relevant provisions of the proposals. AR 1739 (citing CSI's Start-Up Plan), 1757 (same for Greentree's Start-up Plan). An "Acceptable" rating described a proposal that "meets requirements and indicates an adequate approach." *See* AR 552. The Agency's decision to award an "Acceptable" is thus consistent with the RFQ and evaluation instructions.

Second, Greentree's "Outstanding" rating was also appropriate. CSI protests that the qualitative feedback for the offerors was "identical" and given the lack of explanation, suggests the subfactor ratings should be too. Pl.'s Mot. at 25. While all proposals must be treated fairly, procurement law "does not require that all proposals be treated the same." *Chenega Mgmt., LLC v. United States*, 96 Fed. Cl. 556, 585 (2010). *See also* FAR 1.102-2(c)(3). The Agency cited specific portions of the offerors' proposals—proposals that were different.

CSI's "Post-Award Plan" cited by the Agency included a spreadsheet containing a timeline of start-up tasks, proposed deadlines and duration, and relevant employee categories. AR 663, 776. Greentree's corresponding proposal section contained an explanatory paragraph and a table with timelines, key actors, and activities. AR 1282. Plaintiff's proposal emphasized elements related to the transition between contractors, including "Transition Planning," "Finalize staff (both incumbents and non-incumbents)," and "Knowledge Transfer." AR 776. Greentree's plan, by contrast, emphasized minimal transition issues and focused on continuity. AR 1282 ("[O]ur personnel and experience will allow us to successfully perform a transition to a new contract with no break in service."). Thus, the proposals were not the same, and it is reasonable that they were evaluated differently.

The rubric for an "Outstanding" stated the following: "Proposal meets requirements and indicates an exceptional approach and understanding of the requirements. Strengths far outweigh any weaknesses. Risk of unsuccessful performance is very low." AR 552. The cited section of Greentree's proposal described multiple items as "[n]o action required." AR 1282. This was because Greentree's "[s]taff remain[ed] the same," "[they] are already familiar with the programs[,] priorities, policies, and procedures. . . ," and "[their] personnel are trained on all PWS objectives." *Id.* This incumbent knowledge, low-risk transition, and existing staff were elements the Agency fairly credited in other contexts. *See supra* Section IV.1.A–B. Awarding an "Outstanding" rating based on these offered benefits is also consistent with Greentree's evaluation under other subfactors.

Based on the Agency's positive view of these attributes in other subfactors and its focus on minimizing transition risk, it is rational to view a proposal offering a minimal need for action items and a smooth transition as an "exceptional approach." AR 552. The Agency need not ignore an incumbent's natural advantage. *Omega World Travel*, 54 Fed. Cl. at 575. The record reflects why it was reasonable for the Agency to assign different plans different ratings. Procurement officials have "'substantial discretion,' particularly regarding technical ratings 'involv[ing] discretionary determinations of procurement officials that a court will not second guess.'" *Scott Techs., Inc. v. United States*, 168 Fed. Cl. 705, 721 (2023) (quoting *E.W. Bliss Co.*, 77 F.3d at 449) (alteration in original). The Agency's exercise of its technical discretion was consistent with the subfactor's evaluation criteria.

2.       The Assignment of Overall Ratings was Sufficiently Explained.

Second, citing these alleged discrepancies, Plaintiff claims GSA failed to explain "how strengths and weaknesses and . . . subfactor ratings[] translate into [the] overall ratings." Pl.'s Mot. at 26.  But Plaintiff does not demonstrate that the overall ratings contradict the record or that GSA had a burden to explain its overall ratings in detail.

Again, the RFQ did not create a mechanical process for combining ratings.  AR 551–52. This system left discretion to the Agency.  "The Court . . . will not engage in calculating an agency rating by counting" strengths and weaknesses or subfactor ratings—"as plaintiff does, because this court has rejected such an approach." *Harmonia Holdings Grp., LLC v. United States*, 167 Fed. Cl. 448, 474 (2023).  Doing so would be particularly inappropriate here.  "[A] simple comparison of the number of strengths or weaknesses" or subfactor ratings "could not reasonably serve as the basis for determining" the overall ratings because "[t]he analysis to be undertaken under the RFP was a qualitative, not quantitative one." *McConnell Jones Lanier & Murphy LLP v. United States*, 128 Fed. Cl. 218, 230 (2016).

Plaintiff also complains that the Overall Evaluation Summaries are cursory and brief. Pl.'s Mot. at 24–25.  Plaintiff cites a GAO case for the proposition that agencies must "explain why the strengths and weaknesses for each quotation merited the assignment of a particular adjectival rating." *Freealliance.com, LLC et al.*, B-419201.3, 2021 CPD ¶ 56 at 5 (Comp. Gen. Jan. 19, 2021) (finding agency must do more than restate definitions of ratings).  But the Agency complied with these requirements here.  It did not simply offer conclusory recitations of a rating's definition.  It provided summaries that were "tailored to the relevant aspects of the offerors' proposals" and addressed the PWS tasks and the evaluation criteria.  Def.'s Mot. at 29.

Greentree's Factor 1 Overall Evaluation Summary, although brief, is responsive to the subfactor analyses.  Greentree was assessed weaknesses under Subfactors 3 and 4 for failing to address certain elements of the PWS.  AR 1752–53.  The Overall Evaluation Summary addressed these weaknesses, stating "[t]he few items that were not addressed in their quote are non-critical elements of the requirement." AR 1751.  It recognized that the "offeror's quote contains strengths"—15 in total—and determined that they "outweigh any weaknesses." AR 1751–54. Plaintiff's Factor 1 evaluation was similarly responsive.  It noted that CSI's proposal "included granular level details that highlighted every single line item," contained an "exceptional technical approach," and had "multiple strengths demonstrated throughout . . . and no identified weaknesses." AR 1733.  Accordingly, the Agency rated CSI's technical approach "Outstanding." *Id.*

Similarly, for Factor 2, the Overall Evaluation Summaries addressed the strengths and weaknesses calculated, as well as the specific elements of the proposals.  For CSI, the Agency found the proposal to be a "thorough staffing approach that met all the PWS requirements." AR 1737.  Analyzing the proposal qualitatively, it noted "[t]heir plan revolves around the ability to retain around 90% of the current personnel keeping a huge knowledge base intact." *Id.*  This is an element that the evaluators highlighted in Subfactor 1—and is consistent with the Agency's interest throughout in continuity of operations.  *Id.*  It also accurately noted the plan "contains one strength and no identified weaknesses," and assessed the risk of unsuccessful performance as low.  *Id.*  All analyses are supported by facts in the record and are consistent with the "Good" rating the Agency assessed.  *Id.*

The same is true for Greentree's Factor 2 summary, which explained the rating's basis:

> The offeror's quote indicates an exceptional approach and understanding of SAF/FMFSO AFFSO's management and staffing needs.  The proposed key personnel exceed the level needed by education and have years of very relevant and current work experience.  The offeror has an excellent grasp of the skill sets needed to successfully accomplish the tasks called for by the PWS.  Addressed staffing requirements by proposing highly effective personnel by role, education, experience, and required certifications.

AR 1755.

The Agency correctly observed that strengths—of which there were four—"far outweigh[ed] any weaknesses"—of which there were none.  AR 1755–57.  Therefore, the Agency did more than restate definitions, and provided an explanation consistent with *FreeAlliance,* as well as FAR 8.4's limited documentation requirement.  And the same is true for [***]'s and [***]'s overall evaluation summaries, which addressed substantive issues in the proposals and applied the ratings scheme to those facts.  *See, e.g.*, AR 1760, 1764, 1742, 1746.  Similarly, Plaintiff's citation to *Weston Sols., Inc. v. United States* is distinguishable because that case involved rating sheets that were ambiguous because of "mistakes" conceded by the defendant—an error not present here.  95 Fed. Cl. 311, 327–28 (2010).

Finally, CSI complains about differences in documentation in certain subfactors' evaluations.  But the RFQ does not require an extensive analysis for every point, and neither does FAR 8.4.  *See Integrated Fin. & Acct. Sols.*, 161 Fed. Cl. at 495–96.  Caselaw relied upon by Plaintiff also does not stand for this proposition.  The GAO in *FreeAlliance* explained that "our decision does not mean that an evaluation that simply restates a definition is always unreasonable"—just that the agency's evaluation or its response to the protest must "explain[] the basis."  2021 CPD ¶ 56 at 6 n.9.  Most subfactor ratings cite a specific provision of the offeror's proposal, which is consistent with a "truncated procurement process" that allows the Agency to provide a brief explanation.  *Allied Tech. Grp.*, 94 Fed. Cl. at 50.  GSA's documentation is adequate.

## E.       The Agency's Best Value Tradeoff Decision was Not Flawed.

Finally, CSI argues that the Agency conducted a flawed best value tradeoff when it rated the proposals as "comparatively equivalent" and then used price as the determining factor.  But this claim also fails because the Agency provided an adequate analysis as required by caselaw and FAR 8.4.

CSI and Greentree received the three following ratings for their Non-Price factors:

| Contractor | Technical Approach | Management and Staffing | Past Performance |
|---|---|---|---|
| CAN SOFTTECH INC - 47QTCA21D00DL | Outstanding | Good | Substantial Confidence (Very Relevant/Recent) |
| GREENTREE GROUP, INC. - GS35F396DA | Good | Outstanding | Substantial Confidence (Very Relevant/Recent) |

AR 1725.

Plaintiff argues that this equivalency finding was an error because the CO was supposed to look "beyond" or "beneath" the adjectival ratings and explicitly compare the proposals' qualitative merits before deciding they were equivalent.  Pl.'s Mot. at 15–17.  The Government contends Plaintiff's cases are inapplicable and argues FAR 8.4's requirements allow a less stringent level of analysis.  Def.'s Mot. at 15–16.  It also argues that although the explicit comparison of the proposals was brief, the record shows the CO sufficiently analyzed both CSI's and Greentree's technical ratings and their bases in full-page sections.  *Id.* at 14–15.  The Government is correct on both points.

          1.     Best Value Tradeoffs Under FAR 8.4

FAR 8.405-2(f) requires agencies to provide "minimum documentation."  That includes "[t]he rationale for any tradeoffs in making the selection."  FAR 8.405-2(f).  Plaintiff reads this to require "a qualitative comparison in [GSA's] tradeoff decision."  Pl.'s Reply at 9.  However, the plain text of this provision does not mandate the extensive analysis CSI urges.  Nor does Plaintiff offer caselaw suggesting FAR 8.4 requires it.

Plaintiff notes the Court of Federal Claims has found that "*Courts* should look beyond the adjectival ratings because proposals awarded the same adjectival ratings are not necessarily equal in quality."  Pl.'s Mot. at 15 (quoting *Blackwater Lodge & Training Ctr., Inc. v. United States*, 86 Fed. Cl. 488, 514 (2009)) (emphasis added).  In *Blackwater Lodge*, the Court was interpreting FAR 15.308's requirement that an award decision must "be based on a comparative assessment of proposals against all source selection criteria in the solicitation."  86 Fed. Cl. at 514 (citing FAR 15.308).  This explanatory requirement is not contained in FAR 8.4 and is also inapplicable because the RFQ stated that FAR 15.3 procedures do not apply.  FAR 8.401–4.407; AR 551.

Similarly, although this Court found an agency needed to "go beneath" an "identical" rating received by all offerors—it was only where the agency ranked other offerors higher despite receiving the same rating.  *Metcalf Constr. Co., Inc. v. United States*, 53 Fed. Cl. 617, 640–41 (2002).  Here, the CO did not find Greentree and CSI had identical ratings for the relevant technical factors; she found they had separate—although mirrored—ratings for Factor 1 and Factor 2 that contributed to a similar likelihood of successful performance.  AR 1722, 1725.  Nor did the CO rank them on technical capability after determining they were comparatively equivalent.  AR 1755.  The CO instead turned to the fourth factor, price, as allowed by the RFQ.

Plaintiff cites GAO cases finding "[t]he selection official unreasonably compare[d] vendors' adjectival ratings rather than . . . the underlying merits."  *Washington Bus. Dynamics, LLC*, B-421953, 2023 CPD ¶ 286 at 15 (Comp. Gen. Dec. 18, 2023).  These cases are distinguishable.  Several of them interpret FAR 15 or do not indicate the governing regulations.  *See, e.g.*, *Chardonnay Dialysis, LLC*, B-420910, 2022 CPD ¶ 273 (Comp. Gen. Oct. 27, 2022); *Apogee Eng'g, LLC*, B-414829.2 2019 CPD ¶ 85 (Comp. Gen. Feb. 21, 2019); *Cyberdata Techs., Inc.*, B-417084, 2019 CPD ¶ 34 (Comp. Gen. Feb. 6, 2019).  The GAO cases that do apply FAR 8.4 emphasize that agencies need not do a "point-for-point" comparison of offerors' proposals— they need only "consider the underlying bases for ratings, including the advantages and disadvantages associated with the specific content of competing quotations."  *Washington Bus. Dynamics, LLC*, 2023 CPD ¶ 286 at 13–14.  Those cases dealt with records devoid of evidence that the agency qualitatively considered the proposals' merits.  *See, e.g.*, *AT&T Mobility*¸ B-

420494, 2022 CPD ¶ 115 at 6, 10 (Comp. Gen. May 10, 2022).  Here, the record contains the kind of qualitative analysis the GAO found lacking.

Further, Court of Federal Claims decisions reviewing FAR 8.4 best value awards suggests that the CO would not necessarily have erred in "accepting the [Consensus Report's] technical findings without changing or adding to [its] analysis" when there was evidence to support the conclusion.  *Harmonia Holdings Grp.*, 167 Fed. Cl. at 476.  In *Harmonia Holdings*, the Court rejected plaintiff's argument that "the CO's . . . repetition of the [Consensus Report] constitute[d] a failure to articulate a satisfactory explanation."  *Id.*  Since the "solicitation [was] pursuant to FAR Subpart 8.4 . . . only a brief explanation—not an *original* explanation—[was] required."  *Id.* (emphasis in original).  *See also Matt Martin Real Est. Mgmt. LLC v. United States*, 96 Fed. Cl. 106, 117 (2010) (finding CO's reliance "on assigned factor ratings instead of underlying evaluations" would not be error in a FAR 8.4 procurement); *DigiFlight, Inc. v. United States*, 167 Fed. Cl. 158, 173 (2023) (rejecting plaintiff's challenge that agency's Best Value analysis "conducted a superficial tradeoff" that did not discuss "actual differences between the proposals" because of FAR 8.4's minimal documentation requirements) (cleaned up).  The solicitation did not require the award decision to conduct an "independent analysis" of the Consensus Report's findings or reevaluate the technical ratings.  *Am. Relocation Connections, LLC v. United States*, 147 Fed. Cl. 608, 613–14 (2020).  *See also* AR 551–52.  Thus, the Court will uphold the CO's finding of equivalency if the record shows the CO considered the proposals' underlying merits when finding them equivalent.  *Washington Bus. Dynamics, LLC*, 2023 CPD ¶ 286 at 15.

## 2.   The CO Qualitatively Assessed the Proposal's Merits.

The record reflects that the CO did not simply rely on the ratings and addressed the merits of the proposals.  As Greentree was the lowest price offeror, the Agency evaluated the other offerors against its proposal, as allowed by the RFQ.  AR 551.  First, the CO looked past Greentree's ratings to explain why the proposal's elements warranted the rating.  The CO explained why the Factor 1 rating was merely "Good."  Referencing the Consensus Report's assessment of weaknesses for missing elements, the CO reasoned that "the few items that were not mentioned in the package are perceived as non-critical elements."  AR 1722.  It also highlighted another failure "to address the helpdesk utility," which went beyond the information contained in Greentree's Factor 1 Overall Evaluation Summary.  *Id.  See also* AR 1751.  The CO determined "the weaknesses don't outweigh the strengths."  AR 1722.  This discretionary judgment is entitled to deference.  *See, e.g., Scott Techs., Inc.* 168 Fed. Cl. at 721.  For the staffing plan, the CO largely reproduced Greentree's Factor 2 summary.  AR 1722, 1755.  That summary identified qualitative merits of Greentree's staffing and reflected observations made in the Consensus Report.  AR 1722 (noting that "key personnel exceed the level needed . . . [and] covered staffing issues with highly effective personnel by role, education, experience").

The CO did the same for CSI.  The CO's analysis of its "Outstanding" Factor 1 rating largely reproduced its overall summary, which accurately reflected the "granular level details that highlighted every objective listed in the PWS."  AR 1723, 1733–37.  The CO's analysis of the merits of CSI's staffing plan under Factor 2 contained details that make clear she "consider[ed] the underlying bases for ratings, including the advantages and disadvantages associated with the specific content of competing quotations."  *Washington Bus. Dynamics, LLC*, 2023 CPD ¶ 286 at 14.  The CO highlighted CSI's "6-part CST Hiring Process"; explained why

it was a strength in the context of CSI's "understanding of the requirements for systems"; and noted that among other elements, CSI "demonstrated they have done required research on the activities in the office." AR 1723.

The CO's analysis of offerors [***] and [***] similarly highlighted specific strengths—and even more flaws. AR 1724–25. The CO then relied on these details to compare the offerors and find that "Greentree offers the government substantially more confidence in their ability to successfully perform the requirements." *Id.*

Even though some of these analyses reproduce information in the Consensus Report, only a "brief explanation—not an original explanation—is required." *Harmonia Holdings Grp.*, 167 Fed. Cl. at 476 (internal quotations removed) (emphasis in original). The record reflects the CO did not simply rely on the ratings; indeed, she was present for all the evaluations that comprised the Consensus Report. AR 1719. The CO was a non-voting member of the technical Evaluation Team and participated in the Technical Evaluation Board that "conducted . . . a verbal consensus discussion process" to produce the Consensus Report. *Id.* She "reviewed the price quotes and monitored the evaluations." *Id.* Thus, "the record here shows clearly that the contracting officer" did more than just review "all the technical . . . and past performance evaluations before turning to her best value analysis." *Integrated Fin. & Acct. Sols.*, 161 Fed. Cl. at 496.

After looking beyond the ratings to the proposals' merits, the CO compared CSI and Greentree, recognizing that both offerors received different though comparably high ratings for Factors 1 and 2. AR 1722. The CO also addressed the merits of the Factor 3 rating—noting that "both offerors' past performance references involved similar scope and magnitude of effort and complexities described in the RFQ." *Id.* The CO determined that these factors were "rated comparatively equivalent overall and demonstrated a strong capability of performing this work." AR 1725. The CO concluded Plaintiff's proposal did not warrant paying the premium. *Id.*

Plaintiff complains that the CO's decision "discussed the merits and adjectival ratings of each proposal in isolation" and that the determination of comparative equivalence is a "brief comparison" in the CO's penultimate paragraph. Pl.'s Reply at 3. However, as discussed above, agencies need not do a point-for-point comparison of the merits. *Washington Bus. Dynamics, LLC*, 2023 CPD ¶ 286 at 13. *See also Matt Martin*, 96 Fed. Cl. at 117. "The Court considers the entirety of the tradeoff analysis in the [award decision]." *Integrated Fin. & Acct. Sols.*, 161 Fed. Cl. at 495. Thus a "rational reader would have understood the preceding" six pages of the CO's decision "to be documenting the Agency's best value tradeoff analysis." *Id.* (internal quotations omitted). Therefore, it is rational to read the CO's concluding paragraph as incorporating the previous qualitative examination of CSI's and Greentree's merits. It would stray from FAR 8.4's "more simplified and flexible approach," to require the CO to reiterate the analysis completed above. *Allied Tech Grp.*, 94 Fed. Cl. at 50. And although even "only one paragraph to justify the best value tradeoff analysis . . . [may be] sufficient" in a FAR 8.4 procurement, here the Agency offered several pages of analysis. *Integrated Fin. & Acct. Sols.*, 161 Fed. Cl. at 495.

Thus, because the record shows that the agency looked behind the ratings to the qualitative merits and adhered to FAR 8.4's requirements, "[t]he Court will not overturn [GSA's] best value determination merely because [CSI] disagrees with the agency's analysis." *Allied Tech. Grp.*, 94 Fed. Cl. at 50.

**F.     Plaintiff is Not Entitled to a Permanent Injunction.**

To warrant permanent injunctive relief, a plaintiff must establish each of four factors:

(1) whether, as it must, the plaintiff has succeeded on the merits of the case;

(2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief;

(3) whether the balance of hardships to the respective parties favors the grant of injunctive relief; and

(4) whether it is in the public interest to grant injunctive relief.

*PGBA, L.L.C. v. United States*, 389 F.3d 1219, 1228–29 (Fed. Cir. 2004).  Because CSI has not succeeded on the merits, the Court denies its request for injunctive relief.

**V.     Conclusion**

"Procurement officials have substantial discretion to determine which proposal represents the best value for the government." *E.W. Bliss*, 77 F.3d at 449.  On this record, the Agency's decision that an experienced incumbent with a strong technical proposal offered the government the best value was a "coherent and reasonable explanation of its exercise of discretion."  *Dell Fed. Sys.*, 906 F.3d at 992 (quoting *Banknote Corp. of Am.*, 365 F.3d at 1351).  Some of the Agency's explanations were brief, particularly regarding the level of effort.  But Plaintiff did not establish prejudice on the record, and the Court is satisfied that FAR 8.4's requirements were met.  Accordingly, the Court **DENIES** Plaintiff's Motion for Judgment on the Administrative Record and **GRANTS** the Government's and Defendant-Intervenor's Cross-Motions for Judgment on the Administrative Record.  The Court directs the Clerk of the Court to enter judgment accordingly.

**IT IS SO ORDERED.**

 s/ Carolyn N. Lerner
CAROLYN N. LERNER
Judge